**In re Murray C. WILLIAMS, and Judy Williams, Debtors.**

**Bankruptcy No. 95–50444.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Jan. 26, 1996.

Wesley J. Boyer, Macon, Georgia, for Debtors.

John T. McGoldrick, Jr., Macon, Georgia, for Movants.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on motion of Empire Financial Services and Thomas & Howard Company (collectively "Movants") to hold Murray and Judy Williams (collectively "Debtors") in contempt for failure to comply with a Cash

Collateral Order and for violating 11 U.S.C. § 363(c). This is a core matter within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (M). A hearing was held on notice to all parties on October 24, 1995. After considering the evidence from the hearing, as well as supplemental briefs and memoranda, the Court enters the following findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

## FINDINGS OF FACT

Debtors owned and operated a grocery store partnership known as Little River Red & White located at Riverside Plaza in Baldwin County, Georgia. Debtors purchased their interest in the grocery store from Tom Myers on July 28, 1994. The property purchased included real estate and the inventory and equipment located in the grocery store. The real property purchased by Debtors included leased premises containing a pharmacy and beauty salon, from which Debtors derived rental income. The monthly rental income from the pharmacy and beauty salon was $1,500.00 and $350.00, respectively.

As part of the purchase agreement, Debtors assumed the seller's debt to Empire which holds a security interest in the real estate and the inventory, equipment, rental income and accounts receivable of the grocery store. In 1994, Debtors entered into a security agreement with Thomas & Howard Company ("T & H"), granting T & H a security interest in all inventory, equipment, proceeds and accounts receivable of the grocery store. Debtors contend that Movants do not have properly perfected security interests because the financing statements were not filed in the county where Debtors reside.

The debt to Empire is evidenced by two promissory notes, one in the principal amount of $766,000.00, and the other in the principal amount of $204,000.00. When Debtors assumed the indebtedness, the outstanding balances on the notes were $724,572.20, and $162,095.20, respectively. While the record does not reveal the basis for the indebtedness to T & H, that evidence is not necessary to the resolution of this motion.

Debtors filed their petition under Chapter 11 of the Bankruptcy Code on February 15, 1995. At the time of the filing, Debtors reported $87,537.45 in inventory on their schedules. Debtors later realized that the scheduled value of the inventory was based on retail value rather than at cost, as stated in the schedules. The actual cost of the inventory at that time was estimated by Debtor to be between $60,000.00 and $65,000.00. Debtors never notified Movants of this discovery.

Between the date of filing and May 9, 1995, Debtors used the proceeds from the sale of the grocery store inventory and rents from tenants to finance the store's operation without the permission of the Court or Movants. There was an "understanding" between Movants and Debtors as to how the inventory and cash collateral could be used, although nothing was reduced to writing until May 9, 1995.

Debtors testified that they hoped to find a buyer for the grocery store and needed to maintain the appearance that the store was a thriving business. To this end, Debtors used cash collateral and inventory to pay employees as well as various vendors and suppliers. Additionally, Debtors made several cash payments to individuals. In this manner Debtors dispersed Movants' cash collateral until, on April 25, 1995, the balance in the rental account was $696.05, the operating account contained $3,353.97, and the remaining inventory had a value of $29,984.88.

On May 9, 1995, the Court entered a consent order ("Cash Collateral Order") regarding Debtors' use of Movants' cash collateral consisting of proceeds from the sale of Debtors' inventory as well as rents collected by Debtors from the pharmacy and beauty salon. Movants' witnesses testified that the parties' previous "understanding" was reflected in the Court's Cash Collateral Order. The order contained the following requirements:

(1) Debtors were to maintain a balance in the grocery store's operating account and inventory in the amount of $87,537.45, matching the amount of inventory in the store on hand at the time of filing;

(2) Debtors were to notify Movants immediately in the event that the balance in the operating account and inventory dropped below $87,537.45;

(3) Debtors were to serve copies of the monthly operating reports on counsel for Movants, including copies of the check register and bank statements for the operating account on or before the 20th of every month;

(4) Debtors were to maintain a separate, segregated deposit account for the rental income received from the pharmacy and beauty salon which could not be used without further order of the Court;

(5) Debtors were to provide Movants with a monthly bank statement for the segregated account on or before the 20th of every month.

Debtors violated all of the above provisions. While Debtors opened a bank account for the purpose of segregating rental income, Debtors failed to make the required deposits and, further, withdrew deposits in order to fund the day to day operation of the grocery store. Debtors failed to obtain the permission of the Court or Movants prior to withdrawing the segregated rental fund deposits. Debtors' inventory suffered a similar fate. The entry of the Cash Collateral Order did not alter Debtors' unauthorized use of Movants' collateral, and Debtors do not dispute that they failed to comply with the requirements of the Cash Collateral Order.

The Court heard further testimony from James Mashburn, an employee of Debtors, that he observed Debtors removing inventory from the store's premises on the night of June 11, 1995. While the Court accepts that Mr. Mashburn saw Debtors removing items from the store, it was not possible for Mr. Mashburn to conclusively identify the objects removed from the store by Debtors. However, Mr. Mashburn testified that the next working day he could identify missing items as a dozen bags of potatoes, two cases of bananas, a case of New York strip steaks, a ribeye loin and firewood. Debtors admitted to taking steaks, firewood, personal possessions and business records. The Court finds that the value of the misappropriated inventory was $300.

On June 6, 1995, counsel for Debtors sent Movants the first financial reports required by the Cash Collateral Order. Movants requested an inventory, and one was scheduled for June 12, 1995. After Debtors did not appear at the scheduled inventory, Movants filed a motion for relief from the automatic stay. On June 13, 1995, with the consent of Debtors, the Court authorized Movants to take possession of the premises, and the business was closed. Thereafter, Empire took an inventory of all goods, perishable and nonperishable, which reflected $46,305.86 in sellable goods.

Debtors converted the case to Chapter 7 on September 14, 1995. After conversion, Movants foreclosed on the collateral, receiving $11,586.87 as proceeds for inventory and $43,600.00 for equipment.

### CONCLUSIONS OF LAW

■ There is an adversary proceeding pending in this case to determine the secured status of Movants' claims against Debtors. While Movants urge the Court to find Debtors in violation of 11 U.S.C. § 363, governing the use of a creditor's collateral by a debtor, the Court declines to decide that question until the pending adversary proceeding is resolved. As a practical matter, the Court cannot find Debtors in violation of section 363 until the Court first finds that Movants hold secured claims. However, the Cash Collateral Order constitutes a valid order of the Court which Debtors admittedly violated. Therefore, the scope of this order is limited by the terms of that Order.

Should the pending adversary proceeding result in a finding that Movants possess secured claims, the Court will then entertain a motion for sanctions for violation of section 363 if Movants choose to bring such a motion. The relevant dates for the Court's review are between the entry of the Cash Collateral Order (May 9, 1995) and Movants' repossession of the collateral (June 11, 1995). The scope of this opinion will be limited to events and losses occurring between those dates.

The Eleventh Circuit Court of Appeals discussed the inherent power of the Court to sanction contempt in the case of *Glatter v.*

*Mroz (In re Mroz)*, 65 F.3d 1567 (11th Cir. 1995). The court summarized the inherent power of the judiciary as follows:

In *Chambers v. Nasco [NASCO], Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the Supreme Court addressed the nature and scope of a federal court's inherent power to control the proceedings and the conduct of the parties involved. The Court acknowledged that " 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.' " [citations omitted]. These powers are necessarily vested in courts to manage their affairs to "achieve the orderly and expeditious disposition of cases." *Id.* These inherent powers, which are incidental to a federal court, include the power to control and discipline attorneys appearing before it. [citations omitted].

However, because of their potent nature, "inherent powers must be exercised with restraint and discretion." [citations omitted]. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* For example, circumstances which may dictate the exercise of inherent power to assess attorney's fees against counsel, include those where a party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (citations omitted). The imposition of sanctions in that circumstance "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponents obstinacy.' " [citations omitted].

*Id.*, 65 F.3d at 1574–1575.

█ The inherent power of the Court is not a new concept, but has been reinvigorated as of late as a source of authority to effectuate the judicial mandate contained in the United States Constitution. *See e.g. Whitaker v. Belt Concepts of America, Inc.*, 189 B.R. 846 (Bankr.M.D.Fla.1995). The court in *Mroz* recognized that the inherent power of the judiciary may be invoked to punish contempt. *Mroz*, 65 F.3d at 1575, n. 9. A predicate to the use of the Court's inherent power is that the party to be sanctioned must be found to have acted in bad faith. *Id.* at 1575. In addition:

The court must afford the sanctioned party due process, both in determining that the requisite bad faith exists and in assessing fees. *Id.* Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why. [citation omitted]. Notice can come from the party seeking sanctions, from the court, or both. [citation omitted]. In addition, the accused must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions. [citation omitted].

*Id.*, 65 F.3d at 1575.

█ As a practical matter, compliance with the notice requirements of Fed. R.Bankr.P. 9020 [1] satisfies the due process

---

1. Rule 9020 provides:

(a) Contempt Committed in Presence of Bankruptcy Judge. Contempt committed in the presence of a bankruptcy judge may be determined summarily by a bankruptcy judge. The order of contempt shall recite the facts and shall be signed by the bankruptcy judge and entered of record.

(b) Other Contempt. Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule, may be determined by the bankruptcy judge only after a hearing on notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose. If the contempt charged involves disrespect to or criticism of a bankruptcy judge, that judge is disqualified from presiding at the hearing except with the consent of the person charged.

(c) Service and Effective Date of Order; Review. The clerk shall serve forthwith a copy of

concerns of the *Mroz* court. Although the *Mroz* court identified the inherent power of the court as not relying upon any statutory construct or basis, due process nevertheless requires that adequate notice be given.

■■■ The terms of Rule 9020 provide a benchmark against which to measure a respondent's due process rights. This does not mean, however, that parties must comply with Rule 9020 in order to invoke the Court's inherent power. A party's due process rights in the face of sanctions under the Court's inherent power are spelled out in the *Mroz* decision. Compliance with Rule 9020 will ensure that due process is satisfied, but it is not a predicate to providing due process of law.[2]

■■ Debtors were on notice as to the purpose and substance of the Court's hearing on this matter. Debtors knew that Movants sought sanctions against them, and were properly advised as to the basis for Movants' request. Debtors have had the opportunity to respond to Movants' allegations, and have done so both at the hearing and in the form of legal memoranda filed with the Court. In all respects, Debtors have been afforded due process of law consistent with the *Mroz* decision as well as the dictates of Federal Rule of Bankruptcy Procedure 9020. Due process has been satisfied. *Mroz* at 1575.

■■ Upon review of the facts of this case, the Court finds that Movants have carried their burden of showing that Debtors acted in bad faith in violating this Court's order. *Commodity Futures Trading Commission v. Wellington Precious Metals, Inc.,* 950 F.2d 1525 (11th Cir.1992).

Debtors failed to notify Movants that the cash collateral had been reduced below the minimum level established by the Court in its order. Debtors continued to use the cash collateral despite the fact that the Cash Collateral Order prohibited such use. Debtors failed to provide Movants with the required financial statements, and neglected to maintain the segregated accounts called for in the Cash Collateral Order. At the time Debtors realized they could not use cash collateral and still comply with this Court's order, they had a choice of defying the order in hopes of obtaining a purchaser for the grocery store or adhering to the order and ceasing the store's operations pending further order of the Court. Debtors opted to defy the order, and must now face the consequences.

Debtors disregarded the fundamental duty of a debtor-in-possession in failing to adhere to an order of the Court. Debtors disbursed Movants' cash collateral in clear defiance of this Court's order. The Court heard further evidence that Debtors disbursed Movants' collateral by paying off certain other creditors and keeping the business open while Debtors sought a purchaser. Debtors also converted Movants' collateral to their own use by admittingly removing steaks and firewood subject to Movants' security interest, albeit in relatively small amounts. Considering the totality of the circumstances, Debtors acted in bad faith by knowingly defying the terms of the Cash Collateral Order.

■■■ The fact that Debtors would benefit personally from the sale of the business has not escaped the Court's attention. Debtors may not cause creditor's rights to be deferred while imposing their own distribution schemes in defiance of the protections afford-

---

the order of contempt on the entity named therein. The order shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court unless, within the 10 day period, the entity named therein serves and files objections prepared in the manner provided in Rule 9033(b). If timely objections are filed, the order shall be reviewed as provided in Rule 9033.

    (d) Right to Jury Trial. Nothing in this rule shall be construed to impair the right to jury trial whenever it otherwise exists.

Fed.R.Bankr.P. 9020 (West 1995).

**2.** The primary distinction between Rule 9020 and the Court's inherent power is the opportunity for district review prior to the time the order takes effect. This would be significant if incarceration were an issue. In this case, the sanctions are limited to a monetary recovery. The order entered in accordance with this opinion will be a final order, appealable to the District Court. The provisions of the order will pose no immediate jeopardy to Debtors. While Rule 9020 operates as an automatic supersedeas for an order entered in accordance with its provisions, Debtors are free to apply to the District Court for a supersedeas in this case if an appeal is sought.

ed by law to creditors in bankruptcy. Creditors can expect that the Court will enforce its orders, particularly when the creditors' state law rights are deferred in favor of encouraging a debtor's successful reorganization.

When a debtor abuses the system, as these Debtors have, it is the duty of the Court to provide redress for the grievance and to try to restore creditor confidence that the Court will protect those rights which Congress has provided. To this end, the Court finds Debtors in contempt, and enters the following sanctions:

(1) Debtors shall be required to pay the full amount of misappropriated rental payments received between the entry of the Cash Collateral Order and the date Movants took possession of the collateral. The Court finds this amount to be $1,850.

(2) Debtors shall be required to account for the decline in inventory between the entry of the Cash Collateral Order and the date Movants took possession of the collateral. The Court finds this amount to be $5,000. In making this award, the Court notes that Movants bear some of the responsibility for their loss. When Movants saw that Debtors were not complying with the Cash Collateral Order, they should have notified the Court. Since Movants stood to gain from the sale of the grocery store, that motive may have contributed to Movants' inaction. However, while this does serve as a mitigating factor, it does not excuse Debtors' conduct.

(3) Debtors shall be required to pay $2,500 to each of the moving creditors as punitive sanctions for the bad faith defiance of this Court's order. This amount would be more substantial but for the fact that the Court believes other liabilities imposed on Debtors by this order will have a significant and sufficient punitive impact upon Debtors.

(4) Debtors shall be required to pay Movants' attorneys' fees incurred in bringing this action for contempt. If Debtors cannot agree with Movants as to the amount of the fees reasonably incurred, the matter will be set for a hearing, and the Court will determine the amount of the award.

(5) Debtors shall be required to make the payments required in (3) and (4) above in monthly installments of $500 without interest, $250 to be paid monthly to each Movant until the balance due is paid in full. Payments are to begin on February 1, 1996. The Court has heard testimony that Debtors are now both gainfully employed. This monthly payment should be within their means.

(6) The amount required to be paid by (1) and (2) above are to be paid to the party determined by the Court to be the holder of the first lien on the rents and inventory. In the event neither Movant can establish such a claim, the money will be paid to the Chapter 7 Trustee. Payments pursuant to this paragraph are to be made in the amount of $500 per month, without interest, to begin following the completion of payments pursuant to paragraph (5) above.

There is no indication that Debtors diverted any significant amount of Movants' collateral to their own use. The fact that Debtors used the collateral in an effort which could possibly have been beneficial to Movants, points to the conclusion that the conduct was not so reprehensible as to justify incarceration as requested by Movants.